ADAM C. MCCALL
Email: amccall@zlk.com
**LEVI & KORSINSKY LLP**
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
Tel: (213) 985-7290

*Attorneys for Lead Plaintiff Joel Kuhn and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YAKI J. MELLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ARROWHEAD PHARMACEUTICALS, INC., CHRISTOPHER R. ANZALONE, BRUCE GIVENS, and KENNETH A. MYSZKOWSKI,<br><br>Defendants. | Master File No. 2:16-CV-08505-PSG-PJW<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |
| IN RE ARROWHEAD PHARMACEUTICALS, INC. SECURITIES LITIGATION | |

-

Lead Plaintiff Joel Kuhn ("Lead Plaintiff"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation made by and through Lead Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Arrowhead Pharmaceuticals, Inc. ("Arrowhead" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Resonant; and (c) review of other publicly available information concerning Resonant.

Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Arrowhead between January 12, 2015 and November 29, 2016, both dates inclusive (the "Class Period"). Lead Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5promulgated thereunder.

2. Arrowhead, a biopharmaceutical company, develops novel drugs to treat diseases by attacking (or "silencing") the genes responsible for the disease. Arrowhead's lead drug candidate and, by far, most important clinical operation at all relevant times was ARC-520. ARC-520 is an RNA Interference ("RNAi")

therapeutic. RNAi is a process by which RNA molecules prevent gene expression and thereby destroy specific micro-RNA ("mRNA") molecules. ARC-520 was intended to treat chronic hepatitis B virus infection.

3. Critical to this lawsuit is the process by which ARC-520 worked. RNAi therapeutics, including ARC-520, must be introduced into cytoplasm within cells where RNAi activity occurs. The "primary challenge" to developing a successful RNAi drug was the delivery process. One industry expert described the problem with RNAi therapeutics as follows: "RNAi should be the closest thing to a magic bullet for the biopharmaceutical industry. In principle, one can get high-quality [treatment] with very few side effects or off-target effects. ***The problem is that RNAi effectors need to be delivered to the target site in a potent form using the smallest possible amount of material. At present, doses are too high.*** That problem can only be solved with better delivery technologies and improved methodologies" (emphasis added). Scientifically, breakdowns in the delivery process (such as when the RNAi therapeutic detaches or separates from the delivery vehicle before reaching the target site) result in dangerously high levels of toxicity in patients.

4. F. Hoffmann-La Roche AG ("Roche"), a premiere multinational healthcare company, was one of the leading companies in the field of RNAi therapeutics. In 2011, Roche decided to abandon its multi-million dollar RNAi development program, in part, because of the difficulty surrounding the delivery process. Arrowhead purchased Roche's RNAi program and, as noted by the industry publication *Fierce Biotech*, "[t]he little biotech immediately heralded its arrival as one of the world's biggest players in the troubled RNAi field."

5. Among the assets Arrowhead purchased from Roche was a unique, proprietary technology referred to as "Dynamic Polyconjugates® siRNA delivery platform" ("DPC"), which included the "EX1" delivery system. Arrowhead's

former Chief Science Officer, David Lewis, Ph.D., co-invented the DPC technology while at Roche prior to the Arrowhead acquisition.

6. During the Class Period, Defendants repeatedly promoted Arrowhead and its potential breakthrough drug candidate, ARC-520. Defendants presented DPC (or EX1) as a proprietary technology that solved the traditional delivery process problems associated with RNAi therapeutics. Contrary to Defendants, statements, the DPC technology was no safer than the other RNAi delivery systems being developed. The DPC technology utilized an amphipathic membrane-active peptide that resulted in dangerous levels of toxicity. This information was material on the grounds that had investors known the truth, they would have been able to better evaluate the prospects of ARC-520, Arrowhead's ongoing clinical trials, and the benefits of investing in Arrowhead as a whole.

7. Defendants' misrepresentations fall into two categories. First, as explained below in Section IV.B., Defendants materially downplayed the toxicity risks associated with the DPC technology. For example, Defendants repeatedly told the public that ARC-520 and the DPC technology did not present any "dose-limiting toxicities." This was not true, however, because the DPC technology and the manner in which it operated resulted in high toxicity for patients. Proof of this is evident in the fact that the FDA stopped Arrowhead from conducting a proposed clinical trial because the proposed ARC-520 doses exposed study participants to unsafe toxicities. Simply put, Defendants portrayed the DPC technology as safe despite knowing that the DPC technology was dangerous.

8. Second, Defendants misrepresented the data that Arrowhead obtained from non-clinical (animal) studies. As explained below in Section IV.C., Defendants routinely discussed data from non-clinical studies and represented to the public that these data supported the advancement of ARC-520 and/or proved that the DPC technology had been "de-risked" in terms of safety. Contrary to

Defendants' statements, ARC-520 had not been "de-risked." Instead, ARC-520 had already killed a number of non-human primate test subjects in an ongoing non-clinical trial. These non-human primate deaths ultimately led to the FDA's decision to issue a complete clinical hold on all of Arrowhead's ARC-520 clinical studies and, in turn, Arrowhead's decision to abandon all further development of clinical drugs that incorporated the DPC technology (*i.e.*, ARC-520, ARC-521, and ARC-AAT). Far from proving that the DPC technology had been "de-risked," Arrowhead's non-clinical data proved that the DPC technology was still extremely toxic and far too dangerous to administer to humans.

9. The truth concerning ARC-520 and Arrowhead's DPC technology was not revealed until November 8, 2016 when, post-market, Arrowhead issued a press release announcing that the FDA would be placing a clinical hold on the Company's clinical study of ARC-520. The FDA issued the hold due to deaths at the highest dose of an ongoing non-human primate toxicology study. On this news, Arrowhead's share price fell $1.91 per share, or 31.26%, to close at $4.20 per share on November 9, 2016.

10. On November 29, 2016, just three weeks later, Arrowhead informed the market that it was permanently discontinuing all clinical development of ARC-520 and several other product candidates that used the DPC (EX1) delivery technology. The press release also announced that Arrowhead had decided to reduce its workforce by 30%. In response to Arrowhead's announcement, the price of Arrowhead's stock declined by $2.95 per share, or over 67%, to close at $1.44 per share on November 30, 2016.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff alone lost over $1 million. Arrowhead shareholders as a whole lost more

than $306 million. Class members have suffered significant losses and damages due to Defendants fraudulent and/or deliberately reckless conduct.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). Substantial acts in furtherance of the alleged violations or the effects of the violations have occurred in this Judicial District. Arrowhead's principal executive offices are located within this Judicial District, and many of the acts charged herein, including Defendants' preparation and dissemination of materially misleading information, occurred in substantial part in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

16. Lead Plaintiff, as set forth in his Certification accompanying his motion for appointment as lead plaintiff (ECF No. 30-1), purchased common shares of Arrowhead at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

17. Defendant Arrowhead Pharmaceuticals, Inc. is incorporated in Delaware, and the Company's principal executive offices are located at 225 South

Lake Avenue, Suite 1050, Pasadena, California 91101. Arrowhead's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ARWR." The Company was formerly known as Arrowhead Research Corporation and changed its name to Arrowhead Pharmaceuticals, Inc. in April 2016.

18. Defendant Christopher R. Anzalone, Ph.D. has served at all relevant times as the Company's Chief Executive Officer, President, and Director. Anzalone has been President, Chief Executive Officer and Director of the Company since December 1, 2007. In 2005, Anzalone formed and served as CEO of the Benet Group LLC, a private equity firm focused on creating and building new nano-biotechnology companies from university-generated science. Prior to his tenure at the Benet Group, Anzalone was an NIH-supported post doctoral fellow in Reproductive Endocrinology at the Smithsonian Institution's Conservation and Research Center. Anzalone holds a Ph.D. in Biology from UCLA and a B.A. in Government from Lawrence University.

19. Defendant Kenneth A. Myszkowski has served at all relevant times as the Company's Chief Financial Officer.

20. Defendant Bruce Given, M.D. has served at all relevant times as the Company's Chief Operating Officer. Given joined Arrowhead in 2011. Given was a member of the Board of Directors for ICON, plc. (a clinical research organization for drug development) from 2004 until his retirement in 2013 and Chairman of its Board of Directors from 2010 to 2013. Given served as the President and Chief Executive Officer, and as a member of the Board of Directors of Encysive Pharmaceuticals, an R&D-based commercial pharmaceutical company, roles he held from 2002 through 2007. Subsequent to his tenure at Encysive until 2011, Given was President of Bruce Given Consulting, a firm that provides consulting services to biotech companies. Since October 1, 2009, Given

has been a director of Calando Pharmaceuticals, Inc., and from February 2010 until its dissolution in October 2014, Given was the Chief Executive Officer of Leonardo Biosystems, Inc., in which Arrowhead held a minority equity interest. Prior to his tenure at Encysive, Given held several senior executive roles at Johnson and Johnson, Sandoz Pharmaceuticals, and Schering-Plough. Given obtained his bachelor of sciences degree from Colorado State University, his M.D. degree from the University of Chicago, Pritzker School of Medicine, and completed his medical training at the University of Chicago and at Brigham and Women's Hospital in Boston.

21. The Defendants referenced above in ¶¶18-20 are sometimes referred to herein as the "Individual Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

22. Arrowhead is a biopharmaceutical company whose main business is developing RNAi therapeutics. RNAi is a process by which the RNA molecules prevent gene expression and thereby destroys specific mRNA molecules. Arrowhead's focus is to develop drugs that target the RNAi mechanism that will suppress disease-causing genes.

23. In 2011, Arrowhead acquired Roche's entire RNAi portfolio, which included more than forty scientists working at Roche's Madison, Wisconsin site; IP rights from Alnylam Pharmaceuticals ("Alnylam"); a licensing deal with Tekmira Pharmaceuticals Corporation ("Tekmira"); and Roche- Madison's delivery platform. At the time, *Fierce Biotech* commented that through the Roche acquisition, "[t]he little biotech immediately heralded its arrival as one of the world's biggest players in the troubled RNAi field."

24. A drug called ARC-520 was Arrowhead's "lead clinical candidate," was crucial to its business and operations, and constituted a core operation of the

Company. Thomas Wei, an analyst with Jefferies & Co., noted in late 2013 that most of Arrowhead's then-current value was attributable to ARC-520. Indeed, Arrowhead has referred to ARC-520 as one of its "lead product candidates" since 2012.

25. ARC-520 is an RNAi therapeutic that targets the hepatitis B virus ("HBV") for treating chronic hepatitis B, a viral infection that can cause cirrhosis or cancer of the liver. Hepatitis B has been a chronic infection for more than thirty years and has endured despite therapy with anti-viral drugs and exposure to therapeutic vaccines. Approximately 350 million people worldwide are chronically infected with HBV. Thus, the HBV market represents a multi-billion dollar opportunity, particularly given the limitations of currently-available therapeutic regimes. There is an unmet medical need for HBV patients, especially for patients with chronic HBV infection, and any new medicine with increased efficacy and/or safety profile will be in high demand.

26. ARC-520 was Arrowhead's first drug candidate from the Company's DPC technology (along with ARC-521 and ARC-AAT). Arrowhead acquired the DPC technology, among other things, when it acquired Roche's RNAi business in 2011. Arrowhead regarded DPC as the answer to "the primary challenge to siRNA therapeutics," which Arrowhead described as the process of "delivering the fragile, often immunogenic and otherwise rapidly cleared siRNA molecules, into the cytoplasm of the cell, where RNAi activity occurs." Prior to acquiring the DPC technology, "the hurdle of delivery has prevented siRNA therapeutics from reaching their full potential." Arrowhead's former Chief Science Officer, David Lewis, Ph.D., co-invented the DPC technology.

27. Arrowhead heavily promoted the technology after acquiring it. In November 2011, Arrowhead published a "white paper" providing an "overview of

its proprietary [DPC] technology for safe and effective delivery of siRNA." A press release announcing the publication stated, in pertinent part, as follows:

> Safe and effective siRNA delivery has been a key challenge to the field of therapeutic RNAi. The DPC platform was developed over many years by scientists at Arrowhead's newly acquired Madison, Wisconsin research and development facility to overcome this challenge. ***The technology is a radical departure from the standard liposomal or lipid nanoparticle siRNA delivery systems used by the majority of RNAi therapeutics companies. It represents one of the most promising solutions to the delivery problem that has plagued the RNAi therapeutics field since its inception.*** The white paper traces the development of the DPC platform from initial work published in 2007, detailing the critical advances in chemistry and architecture that have occurred over the past four years and culminated in the demonstration of safe and effective delivery of siRNAs to hepatocytes and tumor cells in non-human primates.
>
> "DPCs are elegant, customizable, and powerful new tools to solve the delivery challenge in RNAi and enable the creation of a large variety of new therapeutics," said Dr. Christopher Anzalone, President and Chief Executive Officer of Arrowhead. ***"Studies in non-human primates have shown that DPCs are highly effective and have safety margins well beyond those currently achievable by other systems. Moreover, the modular nature of DPC technology and its ability to optimize individual components within the same polymer provide the potential to target all types of cells. This unparalleled delivery solution complements Arrowhead's portfolio of advanced siRNA delivery solutions, positioning the company as a partner of choice for large biotech and pharmaceutical companies interested in creating RNAi therapeutics."***

(emphasis added)

28. Despite the alleged benefits of DPC, industry experts commented on the fact that DPC had yet to enter clinical trials despite the progress and dramatic investments made by Roche and other well-known RNAi industry players. Significantly, industry experts identified "toxicity issues" as a main drawback to the DPC technology.

29. The DPC technology resulted in unsafe toxicity mainly due to the premature unmasking of the siRNA agent in the blood instead of in the target cells. Multiple dosing, even at low doses, can result in dose accumulation. The instability of the siRNA delivery vehicle, which was the DPC in the case of Arrowhead, caused siRNA treatments to be dangerous.

30. Arrowhead's main business objective was to bring ARC-520 to market. In the United States, pharmaceutical development and marketing is regulated by the FDA, an agency of the U.S. Department of Health and Human Services. The modern regulatory regime was enacted in 1962, after Thalidomide, a sleeping pill, caused birth defects in thousands of babies. In reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the Food, Drug and Cosmetic Act (the "FDCA") requiring that any company that wanted to market a pharmaceutical product in the United States (in industry parlance, a "sponsor") had to obtain prior approval from the FDA, and that the approval had to be based upon substantial scientific evidence—through pre-clinical and clinical trials—demonstrating that the product was safe and effective for its intended use in human beings.

31. A sponsor must obtain permission from the FDA prior to commencing clinical trials. To do so, a sponsor must screen the proposed drug (or biologic) for toxicity with animal studies, and file an Investigational New Drug ("IND") application with the FDA. Although there are technically three types of INDs, virtually all drugs are developed under the standard development IND (also known as an investigator IND). An IND application includes the following information:

(a) Animal pharmacology and toxicology studies sufficient to permit an assessment as to whether the product is reasonably safe for initial testing in human beings. Any previous experience with the drug in

human beings (such as use in foreign countries) also must be included;

(b) Manufacturing information describing the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product. This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug; and

(c) Clinical protocols and investigator information including sufficient detail regarding the proposed protocols for clinical studies to assess whether the initial-phase trials will expose human subjects to unnecessary risks.

21 C.F.R. §312.23.

32. The sponsor must also commit to obtain informed consent from the research subjects, to obtain review of the study by a local institutional review board ("IRB"), and to adhere to the investigational new drug regulations. *Id.* After filing an IND, the sponsor must wait 30 days before commencing human clinical trials.

33. A sponsor generally conducts clinical trials in three phases. These phases, which are codified in FDA regulations, are as follows:

- Phase 1. Phase 1 studies "are designed to determine the metabolism and pharmacologic actions of the drug in human beings the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness."
- Phase 2. Phase 2 studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition

under study and to determine the common short-term side effects and risks associated with the drug."

- Phase 3. Phase 3 studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several hundred to several thousand subjects."

21 C.F.R. §312.21.

34. When a sponsor believes it has conducted sufficient well-controlled clinical trials, and believes that those trials demonstrate substantial evidence of efficacy and safety consistent with the FDCA, the sponsor may prepare and file an New Drug Application ("NDA") with the FDA seeking approval to the market the subject drug in a specific dose for the treatment of a specific condition or "indication." The NDA must also specify how the drug will be manufactured, packaged and labeled. The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria. A sponsor can may only market a drug once the FDA grants an NDA.

35. During the clinical study process, the FDA can issue a "clinical hold" under certain circumstances. A clinical hold is an order issued by FDA to the sponsor of an IND application to delay a proposed clinical investigation or to suspend an ongoing investigation. All or some of the investigations conducted under an IND application may be placed on clinical hold.

36. The FDA may issue a clinical hold in several circumstances, including when human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. For example, the FDA will issue a clinical hold

where: data from animal studies are not sufficient to support the anticipated exposure (dose, route of administration, and duration) for the proposed clinical trial; poor quality non-GLP toxicology studies with difficult to interpret results and a safety signal that has not been sufficiently studied are proposed as pivotal toxicology studies to support use of the product in humans; and previously observed toxicities of the product are not addressed by the proposed safety assessments in a clinical protocol.

37. Whenever the FDA concludes that a deficiency exists in a clinical investigation that may be grounds for the imposition of clinical hold, the FDA will, unless patients are exposed to immediate and serious risk, attempt to discuss and satisfactorily resolve the matter with the IND applicant before issuing the clinical hold order. When a proposed study is placed on clinical hold, subjects may not be given the investigational drug. When an ongoing study is placed on clinical hold, no new subjects may be recruited to the study and given the investigational drug; patients already in the study are expected to be taken off therapy involving the investigational drug unless treatment continuation is specifically permitted by FDA in the interest of patient safety.

38. Arrowhead commenced pre-clinical studies for ARC-520 in June 2012. Arrowhead issued a press release announcing the development as an "important milestone" for the Company. The press release stated, in pertinent part, that:

> PASADENA, Calif. — June 6, 2012 — Arrowhead Research Corporation (NASDAQ: ARWR), a targeted therapeutics company, today announced that its hepatitis B virus (HBV) program has completed all internal preclinical requirements and has named a clinical candidate. As such, the Company has initiated the final IND-enabling steps, including GMP manufacturing, GLP toxicology, and preparation of a pre-IND data package for the US FDA and foreign counterparts. ***The candidate, named ARC-520, is an RNAi***

> ***therapeutic actively targeted to the liver using the company's Dynamic Polyconjugate (DPC) delivery system and includes two siRNA sequences targeting two different regions of the HBV genome***.
>
> "Chronic HBV infection is a serious global health problem with no cure, and we believe ARC-520 can potentially have a substantial impact on patient care worldwide," said Dr. Bruce Given, Arrowhead's Chief Operating Officer and head of R&D. ***"We will continue to take an aggressive stance on development timelines for ARC-520. We anticipate filing an IND in Q2 of 2013 and our plan is to conduct a phase 1 clinical trial in chronic HBV carriers to provide early proof of concept."***
>
> The RNA sequences used in the clinical candidate were part of a large-scale screening program initiated by Roche prior to the acquisition by Arrowhead. The RNAs target regions highly conserved across the major HBV genotypes and ARC-520 contains two distinct RNAs as a strategy to minimize the potential development of resistance in individual patients. Consistent with the company's overarching strategy, the DPCs used in ARC-520 employ active ligand-mediated targeting specific to a receptor on hepatocytes. This approach results in high-potency knockdown of a target gene, validated in mice, rats, and non-human primates and it has demonstrated a low toxicity profile in primates enabling long term dosing.
>
> ***"The promotion of ARC-520 as a clinical candidate, so soon after acquiring the Roche RNAi assets, represents an important milestone for Arrowhead,"*** said Dr. Chris Anzalone, President and Chief Executive Officer of Arrowhead. "This program follows in the footsteps of our clinical stage targeted delivery programs in obesity with Adipotide® and in cancer with RONDELTM and further validates our commitment to ligand-mediated delivery in fields where most delivery is untargeted. We believe that targeting holds great promise in allowing delivery of currently undeliverable agents, such as many RNAs, and may also dramatically improve the balance of safety and effectiveness for many types of small molecule drugs."

(emphasis added)

39. Arrowhead continued its research on ARC-520 over the course of the next two and a half years, reporting positive findings on a frequent basis. In early March 2013, a blogger who had recently attended an RNAi conference in Tokyo reported that Arrowhead's Dr. Lewis presented data on ARC-520 which "include[d] [an] 80% knockdown [reduction] following a single administration after 3 months in non-human primates."

40. Two weeks later, *BusinessWire* reported that "ARC-520 Induces Greater than 90% Reduction in Circulating HBV DNA after a single dose in Chimpanzee with Chronic HHBV" with a headline exclaiming "*Single injection at low end of the projected therapeutic dose range*[.]"

41. On March 25, 2013, Arrowhead formally announced new preclinical data showing that a "low dose" (not numerically specified in the announcement) of ARC-520 induced rapid and deep reductions in viral particles and key viral antigens ("knockdowns") in a single chimpanzee chronically infected with HBV since 1979. Arrowhead claimed that the "low dose" of ARC-520 led to an approximately 90% (1 log) knockdown in HBsAg in the tested primate.

42. In discussing the chimpanzee study, Defendant Anzalone expressly interpreted the results as suggesting a functional cure for HBV in human beings:

> It was the first large primate to be treated with ARC-520, and ***its viral and s-antigen loads were many orders of magnitude higher than what we expect to see in humans. Even with this high bar, we showed that a low dose was effective and extremely well tolerated. There is currently no way to reliably knock down key HBV antigens, thought to be critical to achieving a functional cure of the disease. Our data in multiple rodent models and now in a chimpanzee with chronic HBV infection suggest that ARC-520 may be able to provide this.*** We believe this is very important and positions us well for our planned clinical trials this year.

(emphasis added)

43. The Company further stated that the chimpanzee study "may be predictive of a therapeutic dose range to be identified in upcoming clinical trials expected to start in the middle of [2013]."

44. Arrowhead began clinical trials for ARC-520 in the fall of fiscal year 2013. The Company's Phase 1 clinical trial involved 36 adult volunteers at a single test site located in Melbourne, Australia.

45. Arrowhead launched a Phase 2a trial in March 2014. The study was a multicenter, randomized, double-blind, placebo-controlled, dose-escalation study to determine the efficacy of ARC-520 after a single intravenous dose. Doses ranged from 1.0 mg/kg to 4.0 mg/kg.

46. On December 19, 2014, Arrowhead filed an IND to begin a Phase 2b multiple-dose study of ARC-520. The IND proposed doses of 2.0 mg/kg and 4.0 mg/kg.

47. On January 12, 2015, the FDA verbally informed the Company in a preliminary call of a partial clinical hold. The FDA told Arrowhead that the Phase 2b clinical study would not be approved unless the company started the multiple-dose study at just 1 mg/kg of ARC-520 rather than the proposed parallel study design of 2 and 4 mg/kg. The FDA also required Arrowhead to provide additional information concerning previous testing, including a final study report from the single-dose Phase 2a study in patients who received 1 mg/kg to 4 mg/kg of ARC-520. The FDA also required Arrowhead to provide a final study report from an ongoing multiple-dose non-clinical study.

48. The FDA issued a partial clinical hold in response to Arrowhead's proposed Phase 2b clinical study because it believed that human subjects in the clinical trial would have been exposed to an unreasonable and significant risk of illness or injury relating to toxicity caused by Arrowhead's DPC technology. As discussed above, the FDA issues clinical holds when, for example, data from

animal studies are not sufficient to support the anticipated exposure for the proposed clinical trial, poor quality non-GLP toxicology studies with difficult to interpret results and a safety signal that has not been sufficiently studied are proposed as pivotal toxicology studies to support use of the product in humans, and previously observed toxicities of the product are not addressed by the proposed safety assessments in a clinical protocol. Each of these considerations existed with respect to Arrowhead's proposed Phase 2b study given the toxicity risks associated with the company's DPC technology.

49. In order to remove the FDA's clinical hold, Arrowhead adhered to the FDA's requirements and proceeded with the modified study after receiving FDA approval in April 2015. By this time, ARC-520 was Arrowhead's "most advanced drug candidate in clinical development" and Defendants repeatedly promoted Arrowhead on the prospects of ARC-520. For example, in May 2015, Arrowhead promoted its ARC-520 studies in a quarterly report (Form 10-Q) filed with the SEC, stating that "[t]he Company continues its Phase 2a studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date." Arrowhead similarly portrayed its successful ARC-520 trials when issuing an earnings press release in August 2015, telling investors that Arrowhead had "[c]ompleted dosing in a non-clinical study in chronically infected chimpanzees that spanned more than a year."

50. Investors and analysts alike paid close attention to Defendants' statements. For example, on April 13, 2015, Piper Jaffray reiterated its "overweight" rating for Arrowhead, stating that "Arrowhead is emerging as a leading RNA-interference (RNAi) therapeutic play" after acquiring Roche's "jewel" DPC delivery technology. On June 17, 2015, Deutsche Bank promoted the fact that German regulators gave Arrowhead regulatory clearance to begin a multiple dose study for ARC-520, noting that the development was an

"incremental positive" given that "[r]egulatory bodies have been slow to approve multiple dose studies of ARC-520 . . . ." On September 25, 2015, Piper Jaffray again reiterated its "overweight" rating after attending the "Arrowhead R&D Day" and "walk[ing] away more confident that ARC-520 is an active drug in treatment-naïve, HBeAg+ HBV patients."

51. Arrowhead continued to promote ARC-520 over the course of fiscal year 2016. Not until November 8, 2016 did investors begin to learn the truth about ARC-520 and, in particular, the toxic delivery method that it employed. On November 8, 2016, the FDA placed a clinical hold on Arrowhead's Phase 2 ARC-520 study (referred to as Heparc-2004). ***The FDA ordered the clinical hold after discovering that ARC-520 had killed a number of non-human primates in an ongoing non-human primate toxicology study***. According to a press release issued by Arrowhead announcing the FDA's decision, the study was put on hold "while the [C]ompany provides responses to questions arising from a nonclinical toxicology study in non-human primates using EX1 [a DPC delivery system], the company's liver-targeted, intravenously administered delivery vehicle."

52. Just three weeks later, on November 29, 2016, Arrowhead announced that it was permanently discontinuing all development of ARC-520 and two other drug candidates that also used the DPC delivery vehicle. Arrowhead also announced that, because of the discontinuation of the clinical programs, it would be reducing its workforce by approximately 30%.

53. Unbeknownst to investors at the time, when the FDA initially issued the partial clinical hold in January 2015 in response to Arrowhead's IND for the ARC-520 Phase 2b study, it did so because of concerns over the toxicity of ARC-520 in higher doses and, relatedly, the method by which ARC-520 was being delivered (*i.e.*, the DPC technology), as discussed above.

54. Arrowhead utilized a polymer-based system (DPC) for the delivery of the RNAi therapeutic (also referred to as siRNA) to liver cells. The DPC technology utilized an amphipathic, membrane-active peptide. According to Lori Higgs, a senior chemist of Arrowhead who worked in the company's laboratory facilities in Wisconsin between September 2012 and December 2016, it was the peptide utilized in the DPC technology that resulted in unsafe toxicity. Moreover, according to Ms. Higgs, this particular peptide was what caused the non-human primate deaths at the higher dose levels. Ms. Higgs worked initially for Roche, and then for Arrowhead following the acquisition. Ms. Higgs focused primarily on RNAi conjugates throughout her tenure at Roche and Arrowhead, including in particular synthesizing the peptide material used in the DPC technology involved in the ARC-520 studies.

55. Also unbeknownst to investors, the non-human primate deaths that occurred in the ongoing non-human primate toxicology study had actually occurred several months before the FDA issued the full clinical hold on the ARC-520 Phase 2 studies (Heparc-2004). According to David Rozema, Ph.D., Arrowhead's former Vice President of Chemistry from November 2011 until December 2016, the non-human primate deaths occurred in late-2015 or early-2016. Dr. Rozema managed a team of chemists tasked with developing delivery vehicles for siRNA. Dr. Rozema reported to Arrowhead's former Chief Science Officer, David Lewis, Ph.D., one of the initial developers of the DPC technology. Dr. Rozema was intimately familiar with the DPC technology due to the fact that he helped create it. Dr. Rozema's name appears on numerous articles discussing the DPC technology and even the patent for its creation. Dr. Rozema's involvement with, and responsibility for, the DPC technology supports the conclusion that he was supervising the pre-clinical and clinical studies incorporating his DPC technology.

**B. Defendants Misrepresented the Overall Safety Profile of ARC-520 and Arrowhead's DPC Technology**

56. Defendants materially downplayed the safety risks associated with Arrowhead's DPC technology. The DPC technology, because of the manner in which it operated, posed a serious health risk for patients receiving DPC-administered drugs, *i.e.*, ARC-520, ARC-521, and ARC-AAT. Dose accumulation and premature unmasking (or release of the siRNA agent in non-target cells) resulted in unsafe toxicity in patients. Despite knowing that the DPC technology was dangerous, Defendants repeatedly downplayed the toxicity risks associated with the DPC technology. Defendants' portrayal of the DPC technology misled the market by preventing the public from accurately assessing the risks associated with the DPC technology, ARC-520, and Arrowhead in general.

**January 12, 2015**

57. Arrowhead issued a press release on January 12, 2105 titled "Arrowhead Provides Update on IND for ARC-520 Phase 2b Study." The press release announced that that the FDA placed a partial clinical hold on the Company's proposed ARC-520 Phase 2b study.

58. The press release stated, in pertinent part, that:

> PASADENA, Calif. -- (BUSINESS WIRE) -- Arrowhead Research Corporation (NASDAQ: ARWR), a biopharmaceutical company developing targeted RNAi therapeutics, today announced that the U.S. Food and Drug Administration (FDA) verbally informed the Company in a preliminary call of a partial clinical hold, under which the Company is cleared to begin a modified multiple-dose study of ARC-520 in patients with chronic hepatitis B infection. ***The FDA requested that the Company start the multiple-dose study at 1 mg/kg of ARC-520 rather than the proposed parallel study design of 2 and 4 mg/kg, and requested additional information be provided to the agency. The additional information includes a final study report from the single-dose Phase 2a study in patients who received 1-4***

> ***mg/kg ARC-520, which is ongoing and has not reported any serious adverse events or evidence of end organ toxicity to date. The FDA also requested a final study report from an ongoing multiple-dose non-clinical study, which has shown ARC-520 to be well tolerated with no evidence of end organ toxicity to date.*** The FDA committed to provide the Company with a letter detailing its thoughts and requests within 30 days. The ongoing Phase 2a study continues as planned, and the Company expects to file with Asian and European agencies to begin additional Phase 2b studies in coming weeks.

(emphasis added)

59. The above statements identified in emphasis were materially misleading. Defendants' statements described the FDA's communications with Arrowhead, but omitted critical facts concerning the reason for the FDA's decision to issue the partial clinical hold in the first instance. The FDA issued the clinical hold because of safety concerns related to the toxicity risks associated with the DPC technology. Indeed, as explained previously, the FDA issues clinical holds when human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. Defendants' statements failed to communicate this important fact to investors, stating instead that ongoing studies "ha[d] not reported any serious adverse events or evidence of end organ toxicity to date." Defendants gave investors the impression that the DPC technology was safe when, in fact, the DPC technology was the very reason why the FDA modified the company's clinical trial in the first place. While Defendants were under no requirement to disclose their communications with the FDA, they opted to do so. Once they decided to speak about their communications with the FDA, Defendants were obligated to do so in a manner that would not materially mislead investors. Defendants failed to do this.

60. The safety of Arrowhead's DPC technology was essential to the success of the company's lead drug candidates. Had investors been told that the FDA had serious concerns over the safety of the DPC technology (*i.e.*, concerns

serious enough to warrant a partial clinical hold), they would have been better able to assess the risks associated with investing in Arrowhead. The information omitted form Defendants' above-statements was, therefore, material.

**February 9, 2015**

61. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on February 9, 2015. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

62. The quarterly report misled investors by withholding material information concerning ARC-520 and the basis for the FDA's intervention in the Phase 2b study. In pertinent part, the quarterly report stated as follows:

> During the first quarter of fiscal year 2015, the Company continued to develop its lead clinical candidate, ARC-520, for the treatment of chronic hepatitis B as well as its second clinical candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). ***The Company continues its Phase 2a studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date. The Company submitted an Investigational New Drug application to the U.S. Food and Drug Administration in December 2014 for ARC-520 to initiate phase 2b multi-dose studies to determine the depth of hepatitis B surface antigen (HBsAg) reduction following ARC-520 injection. The Company received feedback from the FDA, and based on that feedback the Company expects to adjust the protocol in order to begin the trial***. The Company also expects to file with Asian and European agencies to begin additional phase 2b studies in fiscal year 2015. Additionally, the Company has submitted an application for ARC-AAT and expects to begin a phase 1 clinical trial soon.

(emphasis added)

63. The above statements identified in emphasis were materially misleading. Defendants' statements described the FDA's communications with

Arrowhead, but omitted critical facts concerning the reason for the FDA's decision to issue the partial clinical hold in the first instance. The FDA issued the clinical hold because of safety concerns related to the toxicity risks associated with the DPC technology. However, Defendants' statements failed to communicate this important fact to investors, stating instead that ongoing studies had not shown any "dose-limiting toxicities" to date. Defendants gave investors the impression that the DPC technology was safe when, in fact, the DPC technology was the very reason why the FDA modified the company's clinical trial in the first place.

64. Arrowhead also hosted an investor conference call on February 9, 2015. During the call, Given provided investors with materially misleading statements about the DPC technology and ARC-520. In pertinent part, Given stated during the call that:

> ***We submitted our IND for ARC-520 in December, and announced in mid-January that we had been given, in communication with FDA -- we have been told, excuse me -- in communication with FDA, that they were uncomfortable with us progressing from single-dose studies directly to a parallel design, multi-dose study, and had thus placed the program on partial clinical hold. We were informed of this during a call, at which time FDA asked us to start the program with a more traditional rising multiple-dose study, beginning at 1 milligram per kilogram, the starting dose in our single dose Heparc-2001 study***. They had promised us a letter within 30 days, fully detailing their thoughts.
>
> We received the FDA letter, and it did not contain any surprises, relative to what had been communicated on the call regarding the partial hold. As such, we had already written a new protocol, which had pretty faithfully captured the main themes. However, the letter also included some recommendations offered, regarding non-hold ideas, that FDA felt would be helpful to the program. We saw these as quite constructive, and recognized an opportunity to adjust the new protocol in a couple of aspects, that took into account FDA

> suggestions, while being helpful and cost sparing to the program overall. This has caused us to make a few tweaks to the prospectively designed study.

(emphasis added)

65. Given made additional material misrepresentations during the question-and-answer segment of the call. In pertinent part, Given stated that:

> <Thomas Wei - Jefferies & Company – Analyst> Thanks. Just a couple questions on the prepared comments, in relation to the FDA letter. Could you be a little bit more specific on what some of these other suggestions were from the agency that you've incorporated in to the protocol? It sounds like it's very helpful stuff, but I'm having a hard time figuring out what the nature of those suggestions might be.
>
> <Bruce Given> Thomas, this is Bruce. ***Some of those were just related to style and format of the way they would like to receive some of the data that we know has been traditionally asked for, in these HBV development programs. But they also had a couple specific suggestions that related, for instance, to how we might look at the potential impact on the PK of tenofovir and entecavir, which, as you know, are the nukes that we are dosing along with***.
>
> ***So it was some of those sorts of things, but they were things that we actually found valuable, and caused us to make a few changes in the protocol. Nothing earth shattering, but helpful.*** And by dealing with some of those now, we think actually money saving and time saving for the program down the road.
>
> . . .
>
> <Thomas Wei - Jefferies & Company – Analyst> That's helpful. And just in the protocol that you have submitted, can you share with us a little bit more detail on the designs that we can map out the potential timing of this? Did the FDA letter contain anything about how long you need to collect data at 1 milligram per kilogram, before you can move on to the next dose? And are you going to be moving through each of these doses sequentially, all the way up through, up to 4 milligrams per kilogram? One, two, three and four? Or can you skip to a higher dose sooner?

> <Bruce Given> It's a rising multiple-dose study. So by definition, you go a dose at a time. That's the mechanism by which you always do rising multiple-dose studies. ***I don't think I'm ready yet to talk about the final design, because until the FDA gives their final blessing, and we're sure we're on exactly the same page, I don't want to speak for them and get out ahead of it***. So once they have approved the trial, it will eventually show up in clinicaltrials.gov, and the design will be clearer.
>
> . . .
>
> <Michael Yee - RBC Capital Markets – Analyst> But are you going to be starting at 2, 3 and 4 milligrams, outside the US? And in the US, you're going to start at the low doses?
>
> <Bruce Given> ***The US, we are definitely starting at 1 milligram per kilogram, because that's where the FDA asked us to start. I think the doses in internationally, I'm not really prepared to talk about it at this point, only because we've got to be working with the international regulatory authorities***.
>
> And just as I really don't want to be negotiating with the FDA in the public sphere, I feel the same way with the international authorities, that we'll see where this winds up. But our feeling is that we have a pretty good chance that they'll go along with the parallel design that we're proposing. But I don't want to necessarily forecast where those doses are going to wind up at this point.

(emphasis added)

66. The above statements identified in emphasis were materially misleading. Given was under no requirement to discuss the company's communications with the FDA, but opted to do so. Once he decided to speak about the communications with the FDA, Given was obligated to do so in a manner that would not materially mislead investors. He failed to do this.

67. In particular, Given created the false impression that the FDA's clinical hold consisted of mere "suggestions" and "recommendations" which the FDA had "offered" because it was "uncomfortable" with Arrowhead's study

design. Given went so far as to even state that the "tweaks" to the study design "related to style and format." While Given mentioned that the FDA had been interested in the "potential impact on the PK [pharmacokinetics] of tenofovir and entecavir," he did so by claiming that the FDA "also had a couple specific suggestions that related" to these things that were "[not] earth shattering, but helpful." ***By no means was the FDA making mere suggestions with regard to Arrowhead's proposed study design—the FDA issued the clinical hold because human subjects are or would be exposed to an unreasonable and significant risk of illness or injury***. Given's description of the FDA's clinical hold was materially misleading when considering the true reasons behind the FDA's decision to halt Arrowhead's proposed study.

68. Had the true reasons for the FDA's clinical hold been disclosed, it would have indicated to investors that the DPC technology was still considered to be highly dangerous by the FDA (notwithstanding Defendants' statements to the contrary). Given the importance of the DPC technology to the company's lead drug candidates, the truth about the DPC technology and the fact that the FDA still viewed it as posing a dangerous safety risk to the public would have altered the total mix of information available to investors.

**April 13, 2015**

69. Arrowhead issued a press release on April 13, 2015 titled "Arrowhead Cleared to Proceed with Multiple Dose Phase 2b Study of ARC-520." The press release announced that that Arrowhead had been cleared to proceed with the ARC-520 Phase 2b study following modifications to the study design, but omitted to tell investors the reasons for the FDA's intervention and/or the need to modify the design in the first place.

70. The press release stated, in pertinent part, that:

> In connection with an IND filed in December 2014, Arrowhead proposed a parallel design multiple-dose Phase 2b study testing doses of 2 mg/kg and 4 mg/kg simultaneously. In January 2015, the FDA notified the Company that a partial clinical hold had been placed on the program. ***In order to proceed with the proposed parallel design study, the FDA requested that the Company provide additional information including data from the single-dose Phase 2a study in patients who receive 1-4 mg/kg ARC-520, data from an ongoing multiple-dose non-clinical study, and data from Heparc-2004 which is now cleared to begin***.

(emphasis added)

71. The above statements identified in emphasis were materially misleading because Defendants concealed from investors the truth behind why the FDA required Arrowhead to modify the Phase 2b study design, which was the risk of unsafe toxicity associated with the DPC technology. Again, like with Defendants' previous statements, Arrowhead downplayed the implications of the clinical hold by describing the FDA's interference as a mere "request[]." In reality, the FDA halted the clinical study because human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. Arrowhead's description of the FDA's clinical hold was materially misleading when considering the true reasons behind the FDA's decision to halt Arrowhead's proposed study.

72. Had the true reasons for the FDA's clinical hold been disclosed, it would have indicated to investors that the DPC technology was still considered to be highly dangerous by the FDA (notwithstanding Defendants' statements to the contrary). Given the importance of the DPC technology to the company's lead drug candidates, the truth about the DPC technology and the fact that the FDA still viewed it as posing a dangerous safety risk to the public would have altered the total mix of information available to investors.

**May 11, 2015**

73. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on May 11, 2015. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

74. The quarterly report misled investors by withholding material information concerning ARC-520 and the basis for the FDA's intervention in the Phase 2b study. In pertinent part, the quarterly report stated as follows:

> During the first half of fiscal year 2015, the Company continued to develop its lead clinical candidate, ARC-520, for the treatment of chronic hepatitis B as well as its second clinical candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). ***The Company continues its Phase 2a studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date. The Company submitted an Investigational New Drug application to the U.S. Food and Drug Administration in December 2014 for ARC-520 to initiate phase 2b multi-dose studies to determine the depth of hepatitis B surface antigen (HBsAg) reduction following ARC-520 injection. The Company received feedback from the FDA, and based on that feedback the Company adjusted the protocol in order to begin the trial. In April 2015, the application was approved by the FDA***. The Company also expects to file with Asian and European agencies to begin additional phase 2b studies in fiscal year 2015. Additionally, the Company has initiated dosing in a phase 1 clinical trial for ARC-AAT following successful completion of the Clinical Trial Notification (CTN) regulatory process in Australia.

(emphasis added)

75. The above statements identified in emphasis were materially misleading. The statements were materially misleading because they concealed from investors the fact that the delivery technology behind ARC-520 had a dangerous propensity to cause high toxicity levels. Similarly, the statements

concealed the fact that the FDA ***required*** Arrowhead to modify the Phase 2b study design because of the risk of unsafe conditions and high toxicity associated with the DPC (EX1) delivery system. Specifically, the FDA ordered Arrowhead to limit dosage due to toxicity. Defendants concealed this information from investors by referring to the FDA's clinical hold as "feedback".

76. Arrowhead also hosted an investor conference call on May 11, 2015. Defendants made material misrepresentations and omissions concerning the safety of the DPC delivery technology during the call. During Anzalone's opening statements, he stated in pertinent part that:

> We also made good progress in the clinical program for ARC-520 our candidate against chronic hepatitis B infection. ***We had productive discussions with the FDA on our plans for a multidose study and received valuable feedback about the program that has been incorporated into our plans for the US, as well as Europe and Asia***.
>
> In April, we gained clearance from the FDA to proceed with the HEP-R2004 clinical study with an initial dose of 1mg per kg. We are pleased to be moving forward with that study here in the US and expect that it will generate valuable data about ARC-520's activity in a multidose setting.
>
> Thus our multiple dose Phase 2B studies remain on track, and we expect to begin dosing patients in the US this quarter. We also believe that we may begin receiving approvals to start international studies this quarter with dosing likely beginning in the summer.

(emphasis added)

77. Given echoed Anzalone's remarks and, in so doing, also misled investors. In pertinent part, Given stated that:

> As we have mentioned before, we still intend to proceed with additional core international multidose trials. ***We have incorporated the FDA recommendations, which are constructed and cost bearing to the program overall, into our international regulatory findings, which have been submitted during the last couple of months***. We're

> working diligently with regulators in select European and Asian countries now, and we intend to provide an update publicly after we have been cleared to proceed.

(emphasis added)

78. Given continued to mislead investors during the question-and-answer segment of the call. In pertinent part, Given stated as follows:

> <Unidentified Participant - Jefferies & Co. – Analyst> This is Carmen on for Eun, thanks for taking the question. So for the multi-dose study in 520 starting out 1 milligram, are you going to need to see the data there before moving into the 2 milligram cohort?
>
> <Bruce Given> ***So what the FDA wants to see, is they want to see the data from this 1 mg per kg US study. They want to see the final study report from the Hong Kong HEPR-2001 study***.
>
> ***Now we can say what the pre-clinical study they are interested in, they saw the interim data from the chimp work. As you might imagine, they found that pretty interesting. They want to see the report from that as well.***
>
> They want to see all of that. You know and that is the data package they are looking for, to deal with the partial clinical hold.

(emphasis added)

79. The above statements identified in emphasis were materially misleading. The statements were materially misleading because they concealed from investors the precise reason why the FDA issued the partial clinical hold, *i.e.*, because human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. Specifically, the FDA ordered Arrowhead to limit dosage due to toxicity. Defendants concealed this information from investors by referring to the FDA's clinical hold as consisting of mere "feedback" and "recommendations."

80. Had the true reasons for the FDA's clinical hold been disclosed, it would have indicated to investors that the DPC technology was still considered to

be highly dangerous by the FDA (notwithstanding Defendants' statements to the contrary). Given the importance of the DPC technology to the company's lead drug candidates, the truth about the DPC technology and the fact that the FDA still viewed it as posing a dangerous safety risk to the public would have altered the total mix of information available to investors.

**August 4, 2015**

81. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on August 4, 2015. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

82. The quarterly report misled investors by withholding material information concerning ARC-520 and the basis for the FDA's intervention in the Phase 2b study. In pertinent part, the quarterly report stated as follows:

> During fiscal year 2015, the Company has continued to develop its lead clinical candidate, ARC-520, for the treatment of chronic hepatitis B as well as its second clinical candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). ***The Company continues its Phase 2a studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date. The Company submitted an Investigational New Drug application to the U.S. Food and Drug Administration in December 2014 for ARC-520 to initiate phase 2b multi-dose studies to determine the depth of hepatitis B surface antigen (HBsAg) reduction following ARC-520 injection. The Company received feedback from the FDA, and based on that feedback the Company adjusted the protocol in order to begin the trial. In April 2015, the application was approved by the FDA.*** In June 2015, the Company received regulatory clearance in Germany for two additional Phase 2b multiple-dose studies of ARC-520 to be conducted in parallel, and also expects to file with additional Asian and European agencies to begin additional phase 2b studies.

(emphasis added)

83. The above statements identified in emphasis were materially misleading. The statements were materially misleading because they concealed from investors the fact that the delivery technology behind ARC-520 had a dangerous propensity to cause high toxicity levels. Similarly, the statements concealed the fact that the FDA ***required*** Arrowhead to modify the Phase 2b study design because of the risk of unsafe conditions and high toxicity associated with the DPC (EX1) delivery system. Specifically, the FDA ordered Arrowhead to limit dosage due to toxicity. Defendants concealed this information from investors by referring to the FDA's clinical hold as "feedback".

84. Had the true reasons for the FDA's clinical hold been disclosed, it would have indicated to investors that the DPC technology was still considered to be highly dangerous by the FDA (notwithstanding Defendants' statements to the contrary). Given the importance of the DPC technology to the company's lead drug candidates, the truth about the DPC technology and the fact that the FDA still viewed it as posing a dangerous safety risk to the public would have altered the total mix of information available to investors.

**<u>September 24, 2015</u>**

85. Arrowhead held an analyst presentation on September 24, 2015. Arrowhead prepared a slide presentation for the conference. Anzalone presented about the benefits of ARC-520 and, in particular, the drug's DPC delivery system. In pertinent part, Anzalone represented that ARC-520 was "well-tolerated" and that the "DPC platform work[s]." Anzalone stated that "ARC-520 has been very well tolerated," ARC-520 has resulted in "No AEs [adverse events] rated as serious or severe," "No discontinuations due to AEs," and "No laboratory signs of end organ tox[icity]." Anzalone also stated that the "DPC platform is potent and consistent" and that it "***de-risks ARC-520 and future candidates built on same DPC***." With regard to future drug candidates built on the same DPC platform,

Anzalone stated that Arrowhead had recently nominated ARC-521 as an additional candidate. About ARC-521, Anzalone stated that it used the "[s]ame DPC as ARC-520, so safety expected."

86. The statement identified above in emphasis was materially misleading because the DPC technology as of the date of the statement had in fact not been "de-risk[ed]." To the contrary, the FDA had issued a clinical hold in connection with Arrowhead's Phase 2b study for ARC-520 because of serious concerns over patient health. Significantly, the FDA was concerned about toxicity arising from the DPC technology, and Defendants knew this. Further, by stating that ARC-520 had been "de-risked," Defendants gave the false impression that ARC-520 was safe and not subject to "dose limiting" toxicity concerns. This was not true, given that the peptide utilized in the DPC technology resulted in unsafe toxicity.

**November 19, 2015**

87. Arrowhead presented at the Jefferies Autumn 2015 Global Healthcare Conference on November 19, 2015. During the presentation, Anzalone misled investors by portraying ARC-520 and its DPC delivery system in an inaccurate manner. In pertinent part, Anzalone stated:

> What we have, I think, is an RNAi platform play with attractive clinical candidates. We've got an awfully large HBV opportunity and a novel first-to-clinic approach. ***Our clinical data this year has de risked both ARC-520 as well as the platform***. ARC-AAT is dosing into phase 1 right now, and we've got a deep pipeline, as is shown here.

(emphasis added)

88. The above statement identified in emphasis was materially false and misleading because it concealed the serious safety risks associated with the DPC technology. Defendants concealed this information from investors while at the

same time promoting the efficacy of ARC-520 and the supposed "de-risking" of the DPC technology in general. As of the date of the statement, the DPC technology had in fact not been "de-risked." To the contrary, the FDA had issued a clinical hold in connection with Arrowhead's Phase 2b study for ARC-520 because of serious concerns over patient health. Significantly, the FDA was concerned about toxicity arising from the DPC technology, and Defendants knew this. Further, by stating that ARC-520 had been "de-risked," Defendants gave the false impression that ARC-520 was safe and not subject to "dose limiting" toxicity concerns. This was not true, given that the peptide utilized in the DPC technology resulted in unsafe toxicity.

**December 14, 2015**

89. Arrowhead hosted an investor conference call on December 14, 2015. During the call, Given misrepresented the safety profile of ARC-520. In pertinent part, Given stated:

> On the safety side, ARC-520 was well tolerated with no serious or severe adverse events, ***no dose-limiting toxicities***, no discontinuations due to the drug and a modest occurrence rate of AEs that were all deemed unrelated to study drug by the principal investigator. No AE occurred more than once. There was a low occurrence rate of abnormal laboratory tests with no observed relationship to timing or dose. There were no laboratory changes believed to indicate drug toxicity.

(emphasis added)

90. The above statement identified in emphasis was materially misleading. The statement was materially misleading because it concealed from investors the fact that the delivery technology behind ARC-520 had a dangerous propensity to cause high toxicity levels that limited dosing capabilities. Proof of this is evident in the fact that the FDA ***required*** Arrowhead to modify the Phase 2b study design because of the risk of unsafe conditions and high toxicity

associated with the DPC (EX1) delivery system. Specifically, the FDA ordered Arrowhead to limit dosage due to toxicity.

**March 17, 2016**

91. Arrowhead presented at the Barclays Global Healthcare Conference on March 17, 2016. Arrowhead promoted itself by emphasizing its "Comprehensive RNAi Platform Built Around Delivery" and describing itself as a "Large HBV opportunity with novel first-to-the-clinic approach" with "***Clinical data [that] has de-risked ARC-520 and platform***." Arrowhead also promoted the safety profile of ARC-520, representing that ARC-520 had a positive safety profile because "No AEs [adverse events] rated as serious or severe," "No signs of end organ toxicity," "No discontinuations due to AEs," and that "ARC-520 has been very well tolerated." Arrowhead also represented that its studies had yielded "Platform and drug validation."

92. The above statement identified in emphasis was materially false and misleading because it concealed the serious safety risks associated with the DPC technology. Defendants concealed this information from investors while at the same time promoting the efficacy of ARC-520 and the supposed "de-risking" of the DPC technology in general. As of the date of the statement, the DPC technology had in fact not been "de-risked." To the contrary, the FDA had issued a clinical hold in connection with Arrowhead's Phase 2b study for ARC-520 because of serious concerns over patient health. Significantly, the FDA was concerned about toxicity arising from the DPC technology, and Defendants knew this. Further, by stating that ARC-520 had been "de-risked," Defendants gave the false impression that ARC-520 was safe and not subject to "dose limiting" toxicity concerns. This was not true, given that the peptide utilized in the DPC technology resulted in unsafe toxicity and, as discussed below, non-human primates had

already died in ongoing non-clinical trials as a result of the DPC technology's toxicity.

**C. <u>Defendants Misrepresented the Data from Arrowhead's Non-Clinical (Animal) Studies</u>**

93. Defendants materially misled investors when discussing the non-clinical data Arrowhead obtained from its ongoing animal studies. While Defendants described the non-clinical study data as supporting the conclusion that the DPC technology had been "de-risked" in terms of safety, the DPC technology had in fact already resulted in a number of non-human primate deaths in Arrowhead's non-clinical trials. These deaths, as explained by Mr. Rozema, occurred in late-2015 or early-2016. Accordingly, by the time Defendants began discussing the non-clinical data on February 9, 2016, a number of Arrowhead's non-human primate test subjects had already died because of ARC-520 and the DPC technology it incorporated. This non-clinical data did not establish that the DPC technology was safe, but instead ultimately proved that it was too dangerous to administer to humans.

**<u>February 9, 2016</u>**

94. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on February 9, 2016. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

95. The quarterly report misled investors by omitting material negative information concerning Arrowhead's non-clinical studies, *i.e.*, that ARC-520 and the DPC technology had already killed a number of non-human primate test subjects. In pertinent part, the quarterly report stated as follows:

> During the first quarter of fiscal year 2016, the Company continued to develop its lead clinical candidate, ARC-520, for the treatment of

> chronic hepatitis B as well as its second clinical candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). The Company continued its Phase 2 studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date. In connection with its Phase 2a study, the Company reported data showing that ARC-520 effectively reduced HBV viral antigens derived from cccDNA. The data showed that HBV surface antigen (HBsAg) was reduced substantially with a maximum reduction of 1.9 logs (99%) and a mean maximum reduction of 1.5 logs (96.8%) in treatment naïve e-antigen (HBeAg)-positive patients. ***The Company also discussed data from an ARC-520 chimpanzee study showing that in chronically HBV-infected chimpanzees treated with ARC-520 in combination with nucleoside analogs, 7 of 9 (78%) exhibited signs of immune reactivation, which is likely a necessary step for achieving a functional cure of chronic HBV. The Company believes these data strongly support advancement of ARC-520 into Phase 2b and future clinical studies***. In January 2016, the Company announced that it had dosed the first patient in its Phase 2b combination study for ARC-520 and is continuing to enroll patients at multiple centers in Australia and New Zealand. The Company submitted an Investigational New Drug application to the FDA which was approved in April 2015 and the Company also received regulatory clearance in Germany for two additional Phase 2b multiple-dose studies of ARC-520 to be conducted in parallel. The Company expects to file with additional Asian and European agencies to begin additional Phase 2b studies.

(emphasis added)

96. The above statements identified in emphasis were materially misleading. By February 9, 2016, non-human primate test subjects had already died in Arrowhead's ongoing non-clinical ARC-520 study. The primates died as a result of the toxicity associated with the DPC technology. Referring to the "data" from the "chimpanzees" as "strongly support[ing]" the "advancement of ARC-520 into Phase 2 and later-stage clinical studies" was materially misleading in light of the fact that ARC-520 and the DPC technology in fact killed a number of non-

human primate test subjects. Defendants' statements in the quarterly report created the false impression that the data from Arrowhead's non-clinical studies was positive when, in fact, it was not.

97. Arrowhead also hosted an investor conference call on February 9, 2016. During the call, Anzalone portrayed the company's non-clinical data in a materially misleading manner. In pertinent part, Anzalone stated:

> ***Does our technology work? Yes. Data in chimps indicate that ARC-520 and ARC-521 are capable of deep-target knockdown***. Substantial clinical data with ARC-520 and ARC-AAT indicate that deep knockdown translates well from non-human primates to humans. Between ARC-520 and ARC-AAT we have seen DPC exposure in well over 150 people and the safety profile has been promising. In fact, they do not believe there's an RNAi delivery platform with a cleaner safety profile in humans than ours.

(emphasis added)

98. The above statements identified in emphasis were materially misleading. The non-clinical data showed that the DPC technology was dangerous and unsafe for humans; however, Anzalone created the impression that the non-clinical data supported the conclusion that the DPC technology "work[s]" in terms of safety and efficacy.

99. The truth concerning the company's non-clinical data would have been material to investors. The DPC technology was the cornerstone of Arrowhead's drug candidate pipeline. The deaths of non-human primates in ongoing non-clinical studies would have signaled to analysts and investors that the DPC technology had in fact not been "de-risked" and required additional research and development to be incorporated with a new drug application before the FDA. Accordingly, the truth about the non-clinical study data would have altered the total mix of information.

**May 10, 2016**

100. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on May 10, 2016. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

101. The quarterly report misled investors by omitting material negative information concerning Arrowhead's non-clinical studies, *i.e.*, that ARC-520 and the DPC technology had already killed a number of non-human primate test subjects. In pertinent part, the quarterly report stated as follows:

> During the first half of fiscal year 2016, the Company continued to develop its lead clinical candidate, ARC-520, for the treatment of chronic hepatitis B as well as its second clinical candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). The Company continued its Phase 2 studies in ARC-520, with no dose-limiting toxicities or serious adverse events having been observed to date. In connection with its Phase 2a study, the Company reported data showing that ARC-520 effectively reduced HBV viral antigens derived from cccDNA. The data showed that HBV surface antigen (HBsAg) was reduced substantially with a maximum reduction of 1.9 logs (99%) and a mean maximum reduction of 1.5 logs (96.8%) in treatment naïve e-antigen (HBeAg)-positive patients. ***The Company also discussed data from an ARC-520 chimpanzee study showing that in chronically HBV-infected chimpanzees treated with ARC-520 in combination with nucleoside analogs, 7 of 9 (78%) exhibited signs of immune reactivation, which is likely a necessary step for achieving a functional cure of chronic HBV. The Company believes these data strongly support advancement of ARC-520 into Phase 2 and later-stage clinical studies.*** In January 2016, the Company announced that it had dosed the first patient in its Phase 2 combination study for ARC-520 and is continuing to enroll patients at multiple centers in Australia and New Zealand. The Company submitted an Investigational New Drug application to the FDA which was approved in April 2015 and the Company also received regulatory clearance in Germany for two additional Phase 2 multiple-dose

> studies of ARC-520 to be conducted in parallel. The Company has also received regulatory clearance in South Korea and Hong Kong. The sites are actively recruiting and treating patients.

(emphasis added)

102. The above statements identified in emphasis were materially misleading. By May 10, 2016, non-human primate test subjects had already died in Arrowhead's ongoing non-clinical ARC-520 study. The primates died as a result of the toxicity associated with the DPC technology. Referring to the "data" from the "chimpanzees" as "strongly support[ing]" the "advancement of ARC-520 into Phase 2 and later-stage clinical studies" was materially misleading in light of the fact that ARC-520 and the DPC technology in fact killed a number of non-human primate test subjects. Defendants' statements in the quarterly report created the false impression that the data from Arrowhead's non-clinical studies was positive when, in fact, it was not.

103. The information about the non-human primate deaths was material. In response to Arrowhead's statements on May 10, 2016, analysts provided favorable opinions about the company. For example, PiperJaffray promoted Arrowhead on the basis of its "[e]xpanding" drug pipeline and the positive data already received from its existing ARC-520 trials. Had analysts known that the DPC technology (which was present in each of Arrowhead's main drug candidates) had killed a number of non-human primate test subjects, they would have been far more cautious in terms of recommending Arrowhead as an investment. Similar to the analysts, investors would have also regarded the information as negative and would have responded accordingly. The fact that ARC-520 had already killed non-human primate test subjects would have altered the total mix of information.

**July 13, 2016**

104. Arrowhead presented at the Cantor Fitzgerald Healthcare Conference on July 13, 2016. Anzalone presented on behalf of the Company. During the presentation, Anzalone misled investors by falsely describing the results of the company's non-clinical (*i.e.*, animal) studies. In pertinent part, Anzalone stated:

> So the drug [ARC-520] was clearly doing what we wanted it to do, it was well-tolerated, these animals received between six and 11 doses of ARC-520. ***There were no signs of tox in these animals and importantly, we saw evidence of immune reactivation in seven of nine of these chimps***. That is a big thing and I don't think that has been shown before in chimpanzees and again, it is thought that this is a relevant model. Chimp HBV is quite similar to human HBV.
>
> . . .
>
> Now we expect the safety profile to be quite similar, probably the same as ARC-520 because that which drives tox is a delivery system, not the sequences so I think that 521 is derisked from a safety standpoint, ***it is derisked from an activity standpoint because of our work with chimps again, we see better than 99% knockdown of S in chimps with ARC-521***. We view this as really complementary to ARC-520 and we are treating subjects as we speak right now in New Zealand.

(emphasis added)

105. The above statements identified in emphasis were materially misleading. By July 13, 2016, non-human primate test subjects had already died in Arrowhead's ongoing non-clinical ARC-520 study. The primates died as a result of the toxicity associated with the DPC technology. Accordingly, it was false to state that Defendants had not seen any "signs of tox[icity]" in the animal studies. Additionally, referring to the "work with the chimps" as a basis for concluding that ARC-520 and ARC-521 was "derisked" was materially misleading in light of

the fact that ARC-520 and the DPC technology in fact killed the non-human primate test subjects.

106. This information would have been material to investors. As of July 13, 2016, the DPC technology was the cornerstone of Arrowhead's drug candidate pipeline. Whether and to what extent the DPC technology was safe and effective greatly impacted the value of Arrowhead as an investment. If the DPC technology was viable in the eyes of investors, then the company's stock represented a relatively safe investment; if the DPC technology was, contrary to Defendants' statements, not yet "derisked" then Arrowhead would have been perceived as a highly speculative and risky investment. The fact that the DPC technology had caused a number of non-human primate test subjects to die because of its toxicity would have indicated to investors that the technology had not yet been "derisked" and, therefore, Arrowhead was a riskier investment than Defendants led them to believe. The truth concerning the DPC delivery would have altered the total mix of available information.

**August 9, 2016**

107. Arrowhead filed a quarterly report (Form 10-Q) with the SEC on August 9, 2016. Myszkowski signed the report on behalf of Arrowhead and certified its contents in accordance with the pursuant to the Sarbanes-Oxley Act of 2002.

108. The quarterly report misled investors by omitting material negative information concerning Arrowhead's non-clinical studies, *i.e.*, that ARC-520 and the DPC technology had already killed a number of non-human primate test subjects. In pertinent part, the quarterly report stated as follows:

> During the first nine months of fiscal year 2016, the Company continued to develop its lead clinical candidate, ARC-520, for the treatment of chronic hepatitis B as well as its second clinical

> candidate, ARC-AAT, an RNAi therapeutic designed to treat liver disease associated with Alpha-1 antitrypsin deficiency (AATD). The Company continued its Phase 2 studies in ARC-520, which continues to be generally well tolerated. In connection with its Phase 2a study, the Company reported data showing that ARC-520 effectively reduced HBV viral antigens derived from cccDNA. The data showed that HBV surface antigen (HBsAg) was reduced substantially with a maximum reduction of 1.9 logs (99%) and a mean maximum reduction of 1.5 logs (96.8%) in treatment naïve e-antigen (HBeAg)-positive patients. ***The Company also discussed data from an ARC-520 chimpanzee study showing that in chronically HBV-infected chimpanzees treated with ARC-520 in combination with nucleoside analogs, 7 of 9 (78%) exhibited signs of immune reactivation, which is likely a necessary step for achieving a functional cure of chronic HBV. The Company believes these data strongly support advancement of ARC-520 into Phase 2 and later-stage clinical studies.*** In January 2016, the Company announced that it had dosed the first patient in its Phase 2 combination study for ARC-520 and is continuing to enroll patients at multiple centers in Australia and New Zealand. The Company also continues to dose patients in multiple additional Phase 2 studies in Europe, Asia and the US.

(emphasis added)

109. The above statements identified in emphasis were materially misleading. By August 9, 2016, non-human primate test subjects had already died in Arrowhead's ongoing non-clinical ARC-520 study. The primates died as a result of the toxicity associated with the DPC technology. Referring to the "data" from the "chimpanzees" as "strongly support[ing]" the "advancement of ARC-520 into Phase 2 and later-stage clinical studies" was materially misleading in light of the fact that ARC-520 and the DPC technology in fact killed a number of non-human primate test subjects. Defendants' statements in the quarterly report created the false impression that the data from Arrowhead's non-clinical studies was positive when, in fact, it was not.

110. Arrowhead also hosted an investor conference call on August 9, 2016. During the call, Given described Arrowhead's study data in a materially misleading manner. In pertinent part, Given stated:

> ***Based on our experience with ARC-520 from all of our studies, we are comfortable that we can dose-escalate rapidly.*** Remember that ARC-521 is built on the same underlying DPC delivery technology as ARC-520. So we think we have a good idea about what to expect from the standpoint of tolerability, dosing and activity.

(emphasis added)

111. The above statement identified in emphasis was materially misleading for the same reasons that Defendants' statements in the quarterly report were misleading. By August 9, 2016, ARC-520 had already killed a number of non-human primate test subjects. Notwithstanding this reality, Given stated during the conference call that their experience with ARC-520 "from all of [the company's studies"—meaning clinical and non-clinical—supported the conclusion that they could "dose-escalate rapidly" and advance through the clinical trial process.

112. The fact that ARC-520 had already killed a number of non-human primates would have been important to analysts and investors. As of August 9, 2016, Arrowhead was still in the enrollment phases of its clinical trials and, as a result, analysts were not expecting to receive clinical data for at least another 12 months. Accordingly, analysts based their ratings on the non-clinical study data that Arrowhead had already obtained. RBC Capital Markets, for example, stated on August 10, 2016 that they "expect[ed] important data over the next 12-18 months, which could help show proof-of-concept and raise investor confidence as we get new data and answers to some of the key questions (potency with multiple doses, duration of effect, combination therapy, seroconversions, etc)." In the same report, RBC noted that "[t]he development of liver, renal, or other off-target

toxicities" was a "risk[]" to its "investment thesis." Accordingly, had Defendants disclosed that ARC-520 had already killed a number of non-human primates, RBC would have noted the fact in its report. This, in turn, would have altered the total mix of information available to investors.

**September 9, 2016**

113. Arrowhead conducted an interview with Bernard Fallon at Biocentury NewsMakers on September 9, 2016. Anzalone spoke on behalf of Arrowhead. During the interview, Anzalone misled investors by falsely stating that data from the company's animal studies had shown ARC-520 and the DPC technology to be safe. In pertinent part, Anzalone stated:

> ARC-521 is optimized to silence both integrated DNA and cccDNA. Again that's different than 520. 520 is only cccDNA. This has been validated in chimps. In those E negative chimps as you recall, we saw about 80% reduction of S antigen with ARC-520. Once we gave them ARC-521, we saw an additional 2 logs of knockdown, or 99% knockdown almost immediately. ***So we think that 521 goes into the clinic truly derisked because of the safety profile of 520 and because of the data in the chimps***. We had regulatory filings in May of 2016. We are in a Phase 1/2 study as we speak and in fact, we have started dosing HBV patients in that study and we have dosing healthy volunteers into this point and now we have started in multiple dose studies in patients.

(emphasis added)

114. The above statements identified in emphasis were materially false and misleading because they concealed the serious safety risks associated with the DPC technology. By September 9, 2016, a number of non-human primate test subjects had already died in Arrowhead's ongoing non-clinical ARC-520 study. The primates died as a result of the toxicity associated with the DPC technology. Referring to the "chimps" as one of the bases for concluding that ARC-520 and ARC-521 was "truly derisked" was materially misleading in light of the fact that

ARC-520 and the DPC technology in fact killed the non-human primate test subjects.

115. The DPC technology was the cornerstone of Arrowhead's drug candidate pipeline. Whether and to what extent the DPC technology was safe and effective greatly impacted the value of Arrowhead as an investment. If the DPC technology was viable in the eyes of investors, then the company's stock represented a relatively safe investment; if the DPC technology was, contrary to Defendants' statements, not yet "derisked" then Arrowhead would have been perceived as a highly speculative and risky investment. The truth concerning the DPC delivery technology was material to investors because it would have altered the total mix of available information.

**<u>September 29, 2016</u>**

116. Arrowhead hosted an investor conference call on September 29, 2016. During the call, Anzalone and Given materially misled investors by providing them with a false description of the results of Arrowhead's non-clinical studies (*i.e.*, animal studies). In response to analyst questions, Anzalone and Given stated the following in pertinent part:

> <Elemer Piros - Cantor Fitzgerald – Analyst> Yes, thank you. Just one more follow-up. I think Alnylam saw this liver toxicity as a dose response, so it was dose responsive. Would you please confirm how many patients you tested at this high of 6 milligram per kilogram dose, how many healthy volunteers?
>
> <Bruce Given> You're talking about as a -- you mean in our clinical programs with (multiple speakers) --?
>
> <Elemer Piros - Cantor Fitzgerald – Analyst> In the AAT program, yes. In the clinical trial.
>
> <Bruce Given> Well, let's see. In normal volunteers, I think we've had maybe four volunteers at 6 mgs per kg; four at 7 and four at 8. I think

> we've had -- and we've also been as high as 6 mgs per kg in ARC-520 as well.
>
> So, yes, they -- I think they saw liver toxicity lower than 6 mgs per kg, but their most toxic patient was at 6 mgs per kg. It's dose-related. It seems the toxicity increases with dose, their data has reported, and they got it as low as 3 mgs per kg. I mean, significant toxicity as low as 3 mgs per kg.
>
> ***We just haven't seen anything at all like that in any of our programs***. They don't think it's inherent to their chemistry. They think it's specific to their sequence.
>
> We can say one way or the other, of course. That's, I guess, a hypothesis for them.
>
> But we [haven't] seen signs in our clinical programs of anything that smells like drug-induced liver injury in transaminasemia at this point (technical difficulty).

(emphasis added)

117. The above statement identified in emphasis was materially misleading. Contrary to what was said, Arrowhead had in fact seen evidence of toxicity in an ongoing non-clinical (*i.e.*, animal) study. By September 29, 2016, non-human primates had ***already*** died as a result of toxicity associated with Arrowhead's DPC delivery system. By stating that they had not seen "anything at all like that" (*i.e.*, toxicity) in "***any of our programs***," Defendants led investors to believe that none of their studies—clinical and non-clinical—had shown evidence of unsafe toxicity. This was materially misleading.

118. Arrowhead's safety data relating to ARC-520 and the DPC delivery system was extremely important to investors, primarily due to the fact that the DPC delivery technology was known to be dangerous. Analyst reports issued after the September 29, 2016 conference call demonstrate the importance of the safety data. For example:

(a) On September 29, 2016, PiperJaffray noted the progress of Arrowhead's "RNAi Pipeline." PiperJaffray described the company as having a "rich early stage RNAi pipeline," but also said that it would "keep a close eye on safety" in light of the fact that Arrowhead's "competitor Alnylam (ALNY) discontinued ALN-AAT due to liver tox."

(b) On September 29, 2016, RBC Capital Markets noted that it was monitoring Arrowhead's studies for the "[e]mergence of serious safety signal that precludes continued development of ARC-520." RBC explained that, "[t]he development of liver, renal, or other off-target toxicities such as severe immunological reactions could result in the termination of this lead program. . . . [C]ontrol of off-target toxicities are common challenges for RNAi-based therapy.

(c) On September 29, 2016, Cantor Fitzgerald stated that "[f]ollowing the liver safety signals announced yesterday afternoon by Alnylam's ALN-AAT program, we do not see liver safety concerns with Arrowhead's ARC-AAT."

119. Each of the above analysts commented specifically on the potential safety risks concerning ARC-520, and noted that evidence of toxicity would affect the rating of Arrowhead as an investment. Accordingly, these analysts would have paid special attention to the fact that non-human primates had ***already*** died as a result of toxicity associated with Arrowhead's DPC delivery system, if Defendants disclosed it.

120. In addition, on September 28, 2017, Alnylam reported that its alpha-1 antitrypsin (AAT) program was halted as a result of dose-dependent liver injury in patients. Alnylam and its AAT program was Arrowhead's direct and only competitor with respect to the company's ARC-AAT drug. In light of the fact that Alnylam halted its AAT program, analysts were closely monitoring Arrowhead's safety data and would have considered the non-human primate deaths material in their overall assessments of Arrowhead.

121. The fact that analysts were paying special attention to the toxicity risks associated with ARC-520 and the DPC technology supports the conclusion that the information about the non-human primate deaths would have altered the total mix of information available to investors. For this reason, the information omitted from Defendants' September 29, 2016 conference call was material.

### D. The FDA Places a Hold on the ARC-520 Clinical Study and Arrowhead Permanently Discontinues All DPC Delivery Technology Development

**November 8, 2016**

122. On November 8, 2016, Arrowhead issued a press release after market hours. The press release revealed that the FDA had placed a clinical hold on the Company's ARC-520 clinical study due to deaths in non-human primates.

123. The press release stated, in pertinent part, that:

> PASADENA, Calif. -- (BUSINESS WIRE) -- Arrowhead Pharmaceuticals, Inc. (NASDAQ: ARWR) is providing an update on its Heparc-2004 clinical study of ARC-520, its therapeutic candidate under clinical investigation for the treatment of chronic hepatitis B virus (HBV) infection. Heparc-2004 is a multicenter, randomized, double-blind, placebo-controlled, multi-dose study of ARC-520, which is currently being performed in up to 12 patients in the United States under an Investigational New Drug (IND).
>
> ***Arrowhead was notified today verbally by the United States Food & Drug Administration (FDA) of its decision to place a clinical hold on Heparc-2004. The study is on hold while the company provides responses to questions arising from a nonclinical toxicology study in non-human primates using EX1, the company's liver-targeted, intravenously administered delivery vehicle.***
>
> . . .
>
> Arrowhead has not yet received written notice of the clinical hold from the FDA; however, ***based on verbal communications the***

> ***clinical hold was prompted by deaths at the highest dose of an ongoing non-human primate toxicology study***. This study involves higher doses of EX1 than those used clinically in humans and higher than those used in the company's previous animal toxicology studies. The cause of these animal deaths is unknown and under investigation. The EX1 delivery vehicle is used in the company's ARC-520, ARC-521, and ARC-AAT programs.

(emphasis added)

124. In response to Arrowhead's announcement on November 8, 2016, the Company's stock price declined by $1.91 per share, or 31%, on heavy trading volume. From a closing price of $6.11 per share on November 8, 2016, Arrowhead's stock price declined to $4.20 per share on November 9, 2016.

125. Although Arrowhead disclosed the fact that the FDA placed a clinical hold on Heparc-2004, Defendants materially downplayed the significance of the toxicity associated with ARC-520 and DPC (EX1). Defendants led investors to believe that the clinical hold was issued in response to concerns associated with only high doses of ARC-520. In fact, the DPC delivery system utilized for ARC-520 was dangerous and would result in Arrowhead permanently discontinuing all development of its drug candidates that used the DPC delivery system. This information was material as it would have altered the total mix of information available to investors.

**November 29, 2016**

126. On November 29, 2016, Arrowhead issued a press release after market hours. The press release revealed that the Company had decided to discontinue development of ARC-520, ARC-521, and ARC-AAT. The press release also revealed that the Company had decided to reduce its workforce by 30%.

127. The press release stated, in pertinent part, that:

PASADENA, Calif. -- (BUSINESS WIRE) -- Arrowhead Pharmaceuticals, Inc. (NASDAQ: ARWR) today announced a strategic redeployment of resources to support the development of RNAi therapeutics that utilize the company's new proprietary subcutaneous (subQ) and extra-hepatic delivery systems. ***Arrowhead will discontinue development of clinical stage drug candidates ARC-520, ARC-521, and ARC-AAT, which utilize the DPC$_{iv}$™, or EX1, delivery vehicle.*** The company is hosting a conference call at 4:30 p.m. EST to discuss this decision.

. . .

***Because of the discontinuation of its existing clinical programs, the company is reducing its workforce by approximately 30%***, while maintaining full resourcing necessary to support current and potential future partner-based programs and Arrowhead's burgeoning pipeline. This more streamlined structure should enable the company to continue to develop its programs rapidly, and is intended to extend its cash runway into 2019.

The decision to discontinue development of EX1-containing programs was based primarily on two factors. First, ***during ongoing discussions with regulatory agencies and outside experts, it became apparent that there would be substantial delays in all clinical programs that utilize EX1, while the company further explored the cause of deaths in a non-clinical toxicology study in non-human primates***. Second, Arrowhead has made substantial advances in RNA chemistry and targeting resulting in large potency gains for subQ administered and extra-hepatic RNAi-based development programs. In preclinical studies with the subQ platform, the company has obtained depth and duration of target gene knockdown approaching that of intravenously administered EX1-containing candidates, at lower doses and with good safety margins.

. . .

However, ***due to likely regulatory considerations, as of this announcement all patient recruitment for ARC-520, ARC-521, and ARC-AAT has been halted and dosing discontinued***. The company will work together with investigators and clinical sites to ensure a smooth transition of study closure and patient medical care.

(emphasis added)

128. Defendants hosted an investor conference call later the same day, November 29, 2016. During the call, Defendants reiterated their decision to discontinue development and reduce their workforce.

129. In pertinent part, Defendants stated as follows:

> <Chris Anzalone>: Thanks, Vince. Good afternoon, everyone, and thank you for joining us. We announced today that we are refocusing our development efforts on our subcutaneous and extra-hepatic delivery platforms for RNAi therapeutics and halting development of our intravenous-administered platform, called DPCiv or EX1. ***As such, we are halting further development of our three clinical candidates -- ARC-520, ARC-521 and ARC-AAT***. Arrowhead is grateful to both the investigators and patients who have taken part in our clinical studies and contributed to the significant increase in scientific understanding of hepatitis B infection, as well as the potential for treating alpha-1 liver disease. We remain committed to finding therapeutic options for these patients and intend to continue to work to advance to the clinic our previously unannounced HBV and AAT programs using our subcutaneous delivery platform. ***As part of this transition, we are making the difficult decision to cut our clinical team and part of our R&D team***. These changes will enable us to continue to move quickly with our subcutaneous and extra-hepatic programs and the partnerships that are based on them while extending our cash runway into 2019.
>
> Let me now walk you through what led to these changes and what they mean for the Company. Let's start with the ARC-520, ARC-521 and ARC-AAT clinical programs. As we have previously reported, more than 300 patients and volunteers have received greater than 800 doses of EX1 across the three programs, at doses as high as 6mg/kg. Three SAEs have been reported, only two of which were deemed drug-related, and we have seen good overall tolerability.
>
> . . .
>
> So what we had were clinical programs that were leading their fields, looked quite positive and we were working hard to move forward rapidly. Importantly, regulators had never expressed any concerns to

> us about our clinical data and to date, that is still the case. ***On November 8, however, we received an oral notification from the FDA advising us that the Heparc-2004 study of ARC-520 was being placed on clinical hold in the United States. This was prompted not by observations from our clinical data of ARC-520 but rather by deaths at the highest dose of an ongoing nonhuman primate toxicology study that was being conducted to support long-term dosing using EX1. Because ARC-520, ARC-521 and ARC-AAT all use EX1, the findings in this toxicology study were reported to regulatory agencies globally, with oversight for all of the programs. Across these three candidates we had ongoing clinical sites and investigators in 17 countries***.
>
> We still have not received written notification from the FDA and do not yet have guidance about what might be required to remove its clinical hold. However, we have been in contact with regulators in all jurisdictions to address questions and provide information as needed.
>
> As results have continued to emerge from the nonhuman primate toxicology study since the November 8 clinical hold and we've had the opportunity to consult experts regarding the results over the past several days, we have considered potential future mechanistic nonclinical studies that would need to be conducted to better understand the causality of the primate deaths. While a path forward has been taking shape, it is becoming increasingly clear that the nonclinical studies required to test our hypotheses would be complicated, time-consuming and expensive.
>
> . . .
>
> As such, ***the Company believes it is prudent to discontinue development of ARC-520, ARC-521 and ARC-AAT***. We will work together with investigators and clinical sites to ensure a smooth transition of study closure and patient medical care.

(emphasis added)

130. In response to Arrowhead's announcements on November 29, 2016, the Company's stock price declined by $2.95 per share, or 67%, on extremely heavy trading volume. From a closing price of $4.39 per share on November 29,

2016, Arrowhead's stock price declined to $1.44 per share on November 30, 2016. Arrowhead's stock price continued to decline the following day, December 1, 2016, closing at $1.32 per share.

**E. <u>Defendants Acted With Scienter</u>**

131. Defendants acted with fraudulent intent and/or deliberate recklessness when making the above misrepresentations and material omissions. As explained in detail below, Defendants closely monitored the ARC-520 study and were intimately familiar with the DPC delivery technology. Defendants also had motive to defraud investors. When the truth finally emerged, Arrowhead terminated the employment of David Lewis, Ph.D., the Company's Chief Science Officer and co-founder of the DPC delivery technology. The critical nature of ARC-520 and the DPC delivery technology strongly supports the conclusion that, at the very least, Arrowhead acted with scienter under the corporate scienter doctrine.

**<u>Defendants Knew that Non-Human Primates Had Died in Late-2015 or Early-2016</u>**

132. Arrowhead's DPC delivery system technology was, by all accounts, the most important aspect of the Company's operations, *i.e.*, the "core" operation. Arrowhead acquired the technology, along with its co-founder, former Chief Science Officer David Lewis, Ph.D., from Roche in 2011. From there, Arrowhead build an entire drug candidate pipeline upon the DPC technology.

133. ARC-520 was first to feature the DPC technology. Arrowhead routinely referred to ARC-520 as its "lead drug candidate" in each of its filings with the SEC during the Class Period. For example, in its quarterly report (Form 10-Q) filed with the SEC on February 9, 2015, Arrowhead reported that "the Company continued to develop its lead clinical candidate, ARC-520 . . . ." Arrowhead's focus on ARC-520 remained constant throughout the Class Period.

Indeed, Arrowhead continued to refer to ARC-520 as its "lead clinical candidate" in its quarterly report (Form 10-Q) filed with the SEC on August 8, 2016. Arrowhead also utilized the DPC technology in ARC-521 and ARC-AAT, the Company's other main clinical candidates.

134. While the DPC technology and, in turn, ARC-520 may have proved effective, it was by no means safe. The DPC technology involved an amphipathic, membrane-active peptide. The particular peptide used produced unsafe levels of toxicity in certain doses of ARC-520. The use of this peptide, which Defendants knew was harmful, was what caused the non-human primate deaths. Notwithstanding the fact that these non-human primate deaths occurred in late-2015 or early-2016, Arrowhead did not disclose this information until November 2016 (and only after being forced to in response to the FDA's decision to place a clinical hold on the Company's ARC-520 Phase 2b trial, Heparc-2004).

135. Given the critical importance of the DPC technology, Defendants closely monitored its safety and efficacy and therefore knew that the DPC technology and ARC-520 posed a serious safety risk. Proof that Defendants closely monitored and were aware of the development of the DPC technology and ARC-520, ***including in particular the harmful toxicity risks associated with the DPC technology***, is evident based upon:

a. The fact that safety and efficacy are required for a sponsor to submit an NDA for marketing approval from the FDA, and Arrowhead was required to obtain evidence of safety and efficacy in order to submit its NDA for ARC-520;

b. Arrowhead's January 12, 2015 public statement showing that Defendants (and, in particular, Anzalone) were engaged in substantive discussions with the FDA about risks associated with higher doses of ARC-520;

c. Anzalone's public statement during the Jefferies Global Healthcare Conference on June 3, 2015 acknowledging that Arrowhead's "limiting factor" for ARC-520 had been "getting our long-term GLP tox [toxicity] done [down]";

d. Anzalone's public acknowledgment during the Jefferies Global Healthcare Conference on November 19, 2015 that Arrowhead "kn[e]w that it [was] the DPC that is the toxic species of these drugs [ARC-520, ARC-521, and ARC-AAT]";

e. The fact that Anzalone acknowledged in his remarks during the Cantor Fitzgerald Healthcare Conference on July 13, 2016 that it was in fact the "delivery system" that "drives tox[icity]" in patients;

f. Given's acknowledgement on September 29, 2016 during Arrowhead's announcement of its collaboration agreement with Amgen, Inc. that the risk of "liver toxicity" is "dose-related";

g. Arrowhead's repeated discussion of the ARC-520 trials and supposed benefits of the DPC technology in SEC filings and analyst presentations;

h. The fact that Arrowhead was responsible for inventing and developing the DPC technology through David Lewis, Ph.D. and the team of researchers, developers, and chemists that Arrowhead acquired from Roche; and

i. The fact that Anzalone and Given, in addition to David Lewis, Ph.D., are sophisticated scientists with substantive experience in Arrowhead's drug pipeline as well as pharmaceuticals in general. Anzalone's and Given's background and experience severely undermines any claim of ignorance or any defense based upon justified reliance.

**Defendants Benefitted Financially from the Fraud**

136. Defendants were motivated to commit fraud. Arrowhead's ability to continue as a going concern was in jeopardy. By concealing the risks associated with the DPC technology and ARC-520, Defendants were able to obtain additional funds through equity financing as well as secure an extremely valuable collaboration arrangement with an industry-leader in human therapeutics.

137. At the start of the Class Period, Arrowhead's accumulated deficit was almost $250 million. This figure increased to almost $400 million by the end of the Class Period. By August 2016, Arrowhead had depleted the majority of its cash. As of May 10, 2016, Arrowhead stated that its "current cash resources may not provide sufficient liquidity to fund operations for at least the next twelve months" based upon its "rate of expenditure to advance its primary clinical candidates through clinical trials."

138. As discussed above, ARC-520 was Arrowhead's lead drug candidate. Completion of the clinical trials for ARC-520 was absolutely required for the purpose of submitting an NDA and receiving approval to market ARC-520. Without FDA approval, Arrowhead was not allowed to sell ARC-520 and, therefore, would not be able to generate revenue. Given Arrowhead's burgeoning deficit, revenue generation was critical to Arrowhead's survival and, indeed, the Individual Defendants' salaries and livelihoods.

139. To generate the funds necessary to continue the ARC-520 clinical trials, Arrowhead conducted a private equity offering in August 2016. On August 12, 2016, Arrowhead closed a private offering with a select group of investors including Orbimed, RA Capital Management, Perceptive Advisors, RTW Investments and certain other institutional investors. Gross proceeds were $45 million. Approximately 7.63 million shares of common stock were issued at a price of $5.90 per share. Although the shares were unregistered at the time of the

offering, the purchase agreement required Arrowhead to register the shares for resale within 90 to 120 days.

140. Arrowhead raised $43.2 million in net proceeds from the offering. In light of the funds Arrowhead raised, the Company was able to report in its August 2016 quarterly report (Form 10-Q) that it "expect[ed] to have sufficient liquidity to fund operations for at least the next twelve months." Arrowhead's need to raise capital was extremely important and not ordinary in nature.

141. Arrowhead's motive in this regard was not akin to the general corporate objective of raising capital shared by all companies. Arrowhead would not have been able to raise this capital if the omitted information about ARC-520 and the DPC technology had been disclosed. Arrowhead, therefore, realized a concrete benefit of $43.2 million as a result of the fraud.

142. The Individual Defendants also benefited personally as a result of the fraud. For the year 2015, the Individual Defendants received the following compensation:

| Name | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|---|---|
| Anzalone | 564,911 | 751,000 | 426,840 | 575,120 | 1,889 | 2,319,760 |
| Myszkowski | 302,375 | 375,500 | 260,123 | 123,136 | 12,967 | 1,074,101 |
| Given | 396,357 | 1,126,500 | 312,147 | 282,464 | 11,399 | 2,128,867 |

143. The Individual Defendants' equity awards, and Anzalone's equity awards in particular, for the year 2015 were dependent upon the achievement of performance milestones. These milestones consisted of the following: filing two new IND applications by March 2018; enrolling patients in a phase 2 or later study; and achieving a significant corporate event (*e.g.*, a significant merger and acquisition transaction). Anzalone was able to accomplish each of these performance milestones as a result of the fraudulent conduct described herein.

144. First, Arrowhead filed initial regulatory applications for two new drug candidates, ARC-AAT and ARC-521 and commenced phase 1 studies for each new candidate. ARC-AAT and ARC-521 utilized the DPC (EX1) delivery technology that was integral to ARC-520. Accordingly, by concealing the risks associated with the DPC technology at issue, Anzalone was able to accomplish this milestone.

145. Second, Arrowhead opened its ARC-AAT Phase 2 study for enrollment in September 2016 and, in so doing, Anzalone accomplished the second milestone. Had Defendants disclosed the risks relating to DPC (EX1), the Phase 2 study would not have proceeded and the milestone would not have been met.

146. Third, the Company entered into a collaboration and license agreement with Amgen, Inc., which qualified as a "significant corporate event." As discussed below, the collaboration agreement with Amgen was a significant benefit to Defendants' fraud. Had Defendants publicly announced the flaws with its DPC delivery technology, the collaboration agreement with Amgen would have been placed in serious jeopardy. Accordingly, by concealing the truth about the DPC technology, Defendants were able to protect the collaboration agreement from cancellation and secure lucrative bonuses at the same time.

147. The bonuses the Individual Defendants received as a result of the fraud were material. For Anzalone and Myszkowski, the equity bonuses were twice the amount of his base salary; for Given, the equity bonuses were more than triple the amount of his base salary. By engaging in the fraud alleged herein, the Individual Defendants benefited themselves financially in a personal and specific manner.

**Defendants Hid the Risks of DPC to Secure a Vital Collaboration Deal**

148. On September 29, 2016, Arrowhead announced that it entered a collaboration deal with Amgen Inc. Amgen is a leading human therapeutics company in the biotechnology industry. Amgen was founded in 1980 and employs over 19,000 full-time employees. Amgen is traded publicly and holds a market capitalization of $118 billion. Agmen's leading products include Enbrel, which treats severe arthritis and similar inflammatory diseases. Amgen sold $5.9 billion worth of Embrel in 2016. Given Amgen's dominance in the human therapeutics industry, Arrowhead's partnership with Amgen was incredibly important.

149. The collaboration agreement provided for the development and commercialization of RNAi therapies for cardiovascular disease. According to a joint press release issued by Arrowhead and Amgen, the RNAi therapies would utilize Arrowhead's "proprietary subcutaneous RNAi delivery platform," which implemented similar aspects of the science behind the DPC delivery technology associated with ARC-520.

150. The collaboration agreement also provided Arrowhead with a massive influx of cash. Under the terms of the agreement, Arrowhead received: $35 million in upfront payments; $21.5 million in the form of an equity investment by Amgen in Arrowhead common stock; and up to $617 million in option payments, and development, regulatory and sales milestone payments. Arrowhead was also eligible to receive royalties for sales of products.

151. Defendants were motivated to conceal the risks associated with DPC for fear of losing the Amgen collaboration agreement. Had Defendants disclosed the toxicity risks associated with the DPC delivery technology, Amgen likely would have decided against collaborating with Arrowhead.

152. Indeed, as Sean E. Harper, M.D., executive vice president of Research and Development at Amgen, said, "Arrowhead's expertise in RNAi

makes them a valuable partner as we translate genetic discoveries into potential therapies that can improve health outcomes for patients." The "expertise" to which Dr. Harper referred was Arrowhead's purported success with the DPC (EX1) delivery system and ARC-520. The truth concerning the DPC delivery system and ARC-520 would have undercut Amgen's confidence in Arrowhead's portfolio and overall reputation and would have placed the collaboration agreement in jeopardy (regardless of whether the RNAi delivery vehicle to be used in the collaboration was exactly the same as the technology used in ARC-520).

153. Whether or not and under what circumstances Amgen could have terminated the collaboration agreement is unknown, as the agreement itself is not public. However, the fact that Arrowhead announced the complete discontinuance of ARC-520 development on November 29, 2016 only ***after*** the collaboration agreement with Amgen officially closed on November 21, 2016 shows that Defendants intentionally withheld the truth about ARC-520 and the DPC delivery system so as not to risk Amgen withdrawing from the agreement.

154. Collaboration agreements such as the one between Arrowhead and Amgen are often far more difficult to cancel once approval is received from the Federal Trade Commission or Assistant Attorney General under the Hart-Scott Rodino Antitrust Improvements Act of 1976. Accordingly, if Amgen has an opportunity to withdraw from the agreement, Defendants effectively precluded Amgen from taking advantage of that opportunity by withholding the truth about ARC-520 and the DPC delivery system from the public until after the agreement officially closed.

155. Defendants conduct with regard to the Amgen collaboration agreement evidences the fact that Defendants knew of the risks associated with ARC-520 and the DPC delivery system during the Class Period, but decided to

improperly and unlawfully conceal those risks from the public. Defendants' conduct supports a strong inference of scienter.

**Arrowhead Fired Chief Science Officer David Lewis, Ph.D.**

156. Arrowhead's decision to fire its former Chief Science Officer, David Lewis, Ph.D. further implicates Defendants as having acted with scienter.

157. Lewis was the co-inventor of the DPC technology that ultimately led to the FDA's decision to place a clinical hold on Heparc-2004. Following Arrowhead's acquisition of the technology, Lewis was tasked with developing and supervising the DPC technology and its implementation in the ARC-520 trials.

158. Following the FDA clinical hold and Arrowhead's decision to permanently discontinue all trials involving the DPC (EX1) technology, Arrowhead terminated Lewis's position with the Company. Arrowhead announced its decision to terminate Lewis's position in a current report (Form 8-K) filed with the SEC on December 1, 2016. Arrowhead's report stated that "[o]n November 29, 2016, [Arrowhead] notified David Lewis, the Company's Chief Scientific Officer, that his position will be terminated, effective December 13, 2016."

159. Arrowhead terminated Lewis's employment with the Company in response to the conduct alleged herein. The nature and timing of Arrowhead's decision to terminate Lewis evidences this fact, as explained below:

a. Arrowhead terminated Lewis's position as Chief Science Officer within days of announcing that it was discontinuing development of ARC-520 due to the dangerous toxicity risks associated with the DPC (EX1) delivery system. The temporal proximity between Arrowhead's announcement and Lewis's termination suggests that the latter was directly related to the former;

b. Lewis was responsible for the DPC (EX1) delivery system. Lewis co-invented the technology while at Roche and then continued to oversee its development while at Arrowhead. The fact that Arrowhead terminated Lewis shows that wrongdoing occurred at Arrowhead, and that Lewis was responsible for the wrongdoing in some material way;

c. The current report did not contain any of the typical salutary words often found in corporate statements announcing high-level resignations, which suggests strongly that Lewis's departure from Arrowhead was involuntary and for cause; and

d. Arrowhead did not pay Lewis a bonus for work performed during 2016 whereas the Company had paid Lewis almost $100,000 in incentive compensation in each 2014 and 2015 (representing an approximate 40% increase to Lewis's base salary in each year).

160. Arrowhead's decision to terminate Lewis's employment shows that wrongdoing occurred at the Company in connection to the DPC (EX1) delivery technology and ARC-520 studies, which further supports the inference that Defendants acted with scienter.

**Corporate Scienter**

161. Arrowhead's public statements about the DPC technology and ARC-520 were critical to the Company's reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Arrowhead's corporate officials knew of the falsity of the statements at the time of publication. Specifically, the knowledge of Arrowhead's former Chief Science Officer, David Lewis, Ph.D., which included the fact that the DPC (EX1) delivery system caused harmful toxicity, is imputed to Arrowhead. Arrowhead acted with scienter under the corporate scienter doctrine.

**F. Presumption of Reliance**

162. The market for Arrowhead's stock was open, well-developed and efficient at all relevant times.

a. Arrowhead stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market. During the Exchange Act Class Period, average daily trading volume exceeded 900,000 shares per day;

b. As a regulated issuer, Arrowhead filed periodic public reports with the SEC and/or NASDAQ;

c. Arrowhead regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Arrowhead was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

163. As a result of the foregoing, the market for Arrowhead stock promptly digested current information regarding Arrowhead from all publicly available sources and reflected such information in Arrowhead's stock price, as evidenced by the price reactions to the disclosures on November 8 and 29, 2016.

164. Defendants' materially misleading statements and/or omissions of material fact caused Arrowhead shares to trade at artificially inflated prices during the Class Period.

165. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of its market price, which reflected all information available to the market concerning Arrowhead, including Defendants' materially misleading statements and material omissions, and have been damaged thereby. When, at the end of the Class Period, Defendants issued new public statements to the market that disclosed the facts previously omitted, and corrected the misleading statements previously issued, the artificial inflation was removed and the Company's share price collapsed.

166. Under these circumstances, all purchasers of Arrowhead's stock during the Class Period suffered similar injury through their purchase of Arrowhead shares at artificially inflated prices, and a presumption of reliance applies.

167. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Arrowhead's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

168. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**G. <u>Defendants' Fraudulent Conduct Caused Investor Losses</u>**

169. Defendants' materially misleading statements and omissions during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Lead Plaintiff and other members of the Class.

117. As alleged herein:

a. the market for Arrowhead's stock was open, well-developed and efficient at all relevant times;

b. Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and the market price of the Company's shares to be artificially inflated during the Class Period;

c. Lead Plaintiff and other members of the Class purchased or otherwise acquired Arrowhead stock relying upon the integrity of the market price for Arrowhead shares and market information relating to Arrowhead;

d. Immediately following disclosures made by Defendants on November 8 and 29, 2016 that corrected the misleading statements made by Defendants during the Class Period and/or marked materialization of risks concealed by Defendants during the Class Period, Arrowhead's share price suffered severe devaluation.

170. Defendants withheld material information concerning the DPC delivery system and ARC-520 throughout the Class Period. The information that Defendants withheld related to the harmful risks of toxicity caused by the DPC

delivery system. These risks severely undermined the chances of Arrowhead conducting successful clinical trials for ARC-520 and obtaining FDA approval for marketing and commercialization. Investors who purchased Arrowhead stock during the Class Period were unaware of these risks and the impact they had on Arrowhead's ability to market ARC-520, and only learned of them when they materialized vis-à-vis the FDA's decision to place a full clinical hold on the Heparc-2004 study (*i.e.*, the ARC-520 Phase 2b study) and Arrowhead's ultimate decision to permanently discontinue all development of ARC-520, ARC-520, and ARC-AAT due to the toxicity associated with the DPC (EX1) delivery technology.

171. In sum, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff and other Class members purchased Arrowhead's stock at prices artificially inflated by Defendants' materially misleading statements and omissions, and when the misleading statements that Defendants made to the market were corrected, and/or the information alleged herein to have been concealed from the market was revealed, the price of the Company's stock significantly declined, causing Lead Plaintiff's and Class Members' losses.

## H. <u>No Safe Harbor</u>

172. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Resonant who knew that the statement was false when made.

## V. CLASS ACTION ALLEGATIONS

173. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Arrowhead common stock traded on NASDAQ during the Class Period and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members the Class is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

175. As of December 12, 2016, Arrowhead had 74.1 million shares of common stock outstanding. Throughout the Class Period, Arrowhead shares were actively traded on NASDAQ, with average daily trading exceeding 900,000 shares per day. Record owners and other members of the Class may be identified from

records maintained by Arrowhead or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176. Lead Plaintiff's claims are typical of the claims of the members of the Classes, as all members of the Class are similarly affected by Defendants' wrongful conduct, in violation of federal securities laws, complained of herein.

177. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

178. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether Defendants' public statements during the Class Period were materially misleading, and/or omitted material facts;

c. whether Defendants acted with scienter in making false or misleading statements during the Class Period; and

d. whether members of the Class have sustained damages and, if so, the proper measure thereof.

179. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**<u>COUNT I</u>**

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants**

180. Lead Plaintiff incorporates herein ¶¶1-179 by reference.

181. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182. Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

183. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Arrowhead common stock. Lead Plaintiff and the Class would not have purchased Arrowhead common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

184. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Arrowhead common stock during the Class Period as set forth above.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

185. Lead Plaintiff incorporates herein ¶¶1-184 by reference.

186. The Individual Defendants acted as controlling persons of Arrowhead within the meaning of §20

187. (a) of the Exchange Act, as alleged herein. By reason of their high-level positions with the Company, their ownership of Arrowhead stock, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and materially misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of the Company, and caused Arrowhead to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Lead Plaintiff contends are false and misleading.

188. The Individual Defendants were provided with or had access to: Company reports, press releases, public filings and other information and statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

189. As set forth above, the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover,

by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause Arrowhead to engage in the wrongful conduct alleged. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Appointing Lead Plaintiff as representatives of the Class, and appointing the law firm listed below as Class counsel;

(c) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(e) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: October 26, 2017 Respectfully submitted,

**LEVI & KORSINSKY LLP**

By: s/ Adam C. McCall

Adam C. McCall
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
Tel: (213) 985-7290
Email: amccall@zlk.com

-and-

Nicholas I. Porritt (*pro hac vice to be submitted*)
Adam M. Apton (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff Joel Kuhn and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2017, I caused the foregoing SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List generated by the CM/ECF system.

s/ Adam C. McCall
Adam C. McCall